## WILLARD *v.* CITY OF DETROIT.

MUNICIPAL CORPORATIONS—CONTRIBUTORY NEGLIGENCE — DEFEC-
TIVE CROSS-WALKS—PERSONAL INJURIES.

>    In an action against a city for personal injuries sustained by
>    plaintiff, a stranger to the locality, who stepped in a depres-
>    sion from 6 to 15 inches in depth, at the end of a bridge
>    across a railway, and who appeared from the evidence to
>    have first observed the depression at the instant he stepped
>    into it, the court erred in directing a verdict for defend-
>    ant on the ground of plaintiff's contributory negligence, since
>    different inferences might reasonably be drawn concerning
>    his want of care in observing the condition of the street and
>    his safety if he proceeded.

Error to Wayne; Rohnert, J.  Submitted November
30, 1910.  (Docket No. 128.)  Decided December 30,
1910.

Case by Rufus A. Willard against the city of Detroit
for negligence.  A judgment for defendant on a verdict
directed by the court is reviewed by plaintiff on writ of
error.  Reversed.

*Washington I. Robinson*, for appellant.

*Edmund Atkinson* (*P. J. M. Hally*, of counsel), for
appellee.

OSTRANDER, J.  Twelfth street in the city of Detroit
runs north and south, and is carried over the tracks of
the Michigan Central railroad on a bridge.  The first in-
tersecting street north of the bridge is Howard street,
the level of which is somewhat lower than the level of the
bridge.  At the north end of the bridge an alley leaves
Twelfth street, running easterly, parallel with the railroad,
descending as it leaves Twelfth street, and the level of

164 MICH.—16.

the alley is lower than the level of the bridge. Plaintiff crossed the bridge January 14, 1908, at about 11 o'clock in the forenoon. He claims that in stepping from the end of the bridge, or from the north abutment thereof, he fell and broke his leg, and to recover damages for this injury he brought this action against the city. The court, upon the case made for the plaintiff (no testimony was introduced by defendant), being of opinion that the contributory negligence of plaintiff was established, directed a verdict for the defendant, which was followed by judgment. The charge delivered to the jury in directing a verdict is the basis of the errors assigned and discussed in the brief for appellant.

It is alleged in the declaration, in substance and effect, that at the point on the east side of Twelfth street where it, or the east sidewalk on it, crosses the alley which has been referred to, and where the bridge ends, there was a drop and a "depressed, sunken, defective, dangerous, and perilous condition of the said crosswalk," where it had "become sunken, depressed, and had fallen several inches below its normal grade," and that "a vertical declivity and abruption existed." The testimony on the part of the plaintiff tended to prove that there was some difference in the levels (elevations) of the bridge proper, including the abutment thereto, and the ground immediately at the end of the bridge and in the alley. From the bridge and across the alley, the way was made of crushed stone. The drop or fall was at the end of the bridge. Witnesses describe it variously as a depression and drop and space, and the variation of levels as 5 or 6, and 6 or 8, and 10 or 12, inches. Plaintiff testified that he "calculated there was certainly 15 inches of depression by the end of the bridge, where I tripped."

Whatever the condition was, it had existed for several months. The testimony of the plaintiff tended to prove that upon this occasion he was walking for his pleasure.

"I was observing the work on the tunnel, an elevator running on an incline, and when I got to the end of the

bridge walk I did not notice any particular depression.   I
walked along and let go of the rail and just then I heard
a whistle and I turned to see the cause of the whistle, and
just then I stepped, and as I stepped, I came down and
heard a crack in my leg, and I realized that I had broken
my leg.   I lay there for a few minutes in a dazed condi-
tion and then I looked around and saw the fence of Mrs.
Graham's property.   I saw the depression then in the
roadway; it seemed as though the surface had washed
away, and there was quite a depression there.   I con-
cluded there was certainly 15 inches of depression by the
end of the bridge there, where I tripped.   A policeman
then came up and some other gentlemen, and they helped
me into this little store.   That drop, it seems to me, was
a sudden one, like stepping off a step.   A locomotive
whistled, startled me, and I turned to see it just as I
stepped.   I have lived in Detroit two years, but had never
been in that location before.   As I walked along, before I
fell, I moved my hand along on top of the rail and the
walk seemed clear of ice and snow.   After I fell, I saw
snow at the edges and in crevices, but in the center, where
I lay there, it was almost free of ice.   I don't think there
was any ice there that I noticed; it had melted away
leaving cinders and ashes.   When I fell, I came right
down solid.   I stepped right off.

"*Q.* As though you would step downstairs?

"*A.* Yes, I miscalculated my step.   *   *   *   [I don't
remember going over that bridge before.   That day I fell
was a clear day; there was nothing to interfere with my
seeing where I was going; I was carrying no bundles,
and there were no obstructions and no trees, nor anything
to block my view.   I was talking to no one; I was alone.
I was walking north on the east side of Twelfth street,
on a wooden walk, with my hand on the rail; I did not
observe any slope or any ice on the pavement.   When I
let go of this handrail and stepped off this wooden walk, I
fell with full force on this leg and broke it.   Just as I was
stepping off, I heard the whistle of an engine.   I was
looking at the tunnel operations down in the Michigan
Central right of way; I was looking sideways and back-
wards in a measure, but I was not looking at them con-
stantly.   I threw my eyes around as I approached the
bridge.   I was on the crossing; I intended to make the
crossing, but I was deceived about the space of depth
there, where the earth had been washed away, or had

sunk away. There was nothing to interfere with my view; there was no obstruction. My eyes are fairly good.

"*Q.* You had not heard of any washing away of the earth there at any time?

"*A.* Why, the alley was not on a line as it should be with the end of the bridge.

"*Q.* We have covered that question. As you cast your eyes ahead, and saw this depression, you stepped down from the end of the wooden walk of the bridge?

"*A.* I saw it at a glance; yes, sir.

"*Q.* There was nothing to interfere with your taking it all in as you looked at it; there was nothing to obstruct your view in any way?

"*A.* There was no obstruction there.

"*Q.* Your eyes were fairly good, or were at that time?

"*A.* Fairly good.

"*Q.* Now you may tell us the depth of that spot; I think you stated it to Mr. Seely.

"*A.* I think it was—I thought at the time it was a slight spot; I found I was mistaken when I reached the bottom of it. If it had been in proper condition and filled up even to the floor of the bridge, there would not have been an accident.

"*Q.* The accident was caused by the fact that there was a deep spot at the end of the wooden walk?

"*A.* It was caused, of course, because there had been a failure to keep it filled in.

"*Q.* You are drawing conclusions. Was it caused by the step at the end of the wooden walk? Was that the cause of the accident?

"*A.* I don't understand your drift.

"*Q.* You say if there had been no step there, it would not have happened.

"(*Mr. Robinson:* He did not say a step; he said if there had not been a depression there, that place washed out.)

"*Q.* So that all you know of what caused the accident was that that step was deeper than you had calculated it to be by looking at it?

"*A.* Yes, sir.

"*Q.* Now, in addition to that icy condition, this condition at the step contributed to your fall, did it not?

"*A.* Possibly; I don't know.

"*Q.* What is your best judgment in that respect; did it or did it not, the icy condition at the step there, contribute to your accident?

"*A.* Well, I judge, of course—as I said before—I judged that the step was not as deep as I found it to be.

"*Q.* In addition to that, I ask you with reference to whether the icy condition of the walk at the foot of that step contributed in a measure to your loss of your footing?

"*A.* I answer you that possibly it might.

"*Q.* Do you think it did?

"*A.* I don't know.

"*Q.* Would you say it did; you said that you did not notice any ice on the bridge; you were not looking particularly to observe whether the walk was icy or not?

"*A.* My recollection was that there was no ice on the bridge, on the footwalk of the bridge; that is my recollection.

"*Q.* Let me ask you if, when you came, after you had come to the end of the rail and had let go of the rail, if your feet went out from under you, had you cleared the rail on which your right hand rested?

"*A.* I think I was just in the act of the step down when I turned to see what the whistle meant.

"*Q.* Did you notice the rail ceased just at that point?

"*A.* Yes, sir.

"*Q.* Did you—that you could not longer rest your hand on it?

"*A.* Yes, sir.

"*Q.* You had your hand off of the rail; you had let go of the rail before you fell?

"*A.* Yes, sir.

"*Q.* Almost the same instant?

"*A.* Yes; just as I stepped, simultaneously.

"*Q.* But you were found—you found yourself on the ground some five feet from the step—some witnesses said. As your feet went out from under you, did you slide down in any way?

"*A.* No, sir; I came down like that; I stepped down and sunk right down on my side here, as I said before; I cracked the bone. I heard the bone crack as I stepped down and lay there in a partially dazed condition, realizing the condition of my leg, just as things come on your mind when you have time to think of them. There was nobody near by there at first, that is, I saw nobody near by; but a little later, a few minutes after, a policeman' came and one or two witnesses helped him put me into this little store.   *   *   *

"*Q.* Was there anything to hinder your stepping to the

opposite side of that walk and avoiding this step which you saw ahead of you?

"*A.* I don't remember.

"*Q.* There was no obstruction at all, was there, Mr. Willard?

"*A.* The walk—I was on the walk of the bridge—and it seemed to be perfectly clear. There seemed to be no obstruction there.

"*Q.* Nothing to hinder your crossing over to the left-hand side of the walk?

"*A.* No.

"*Q.* And nothing to hinder your continuing on the left-hand side, and avoiding this step?

"*A.* Well, it didn't occur to me. There was no necessity of avoiding it.

"*Q.* No; and you had looked at the step as you saw it ahead of you; but coming back again, I ask whether there was anything to hinder you stepping across and continuing on the left-hand side and so avoiding the step?

"*A.* I did not consider that; I couldn't answer that question.

"*Q.* You don't recall any obstruction of any sort, do you?

"*A.* No; I didn't see any obstruction.   *   *   *

"*Q.* Now, isn't it a fact, Mr. Willard, that looking at this step, if you thought that it ought to be avoided, that by stepping a few feet to one side you would have avoided it?

"*A.* I saw no step there. When you speak of a step, do I understand you to mean the end of the bridge? And after I left the bridge I would step—what I mean by that, the next step would be down in the depression of the right of way, and there is where I landed—   *   *   *

"*Q.* Could you see the character of this crosswalk, as you approached it?

"*A.* I didn't notice it. I didn't notice it until I landed on it.

"*Q.* Could you then see what it was?

"*A.* Yes, sir.

"*Q.* What was it?

"*A.* There was some dirt and ice, more dirt than ice and cinders.

"*Q.* You told us this morning it was stone and cinders.

"*A.* I don't remember; I may have said cinders; I don't recollect seeing any stone there. It was almost

free; there was just a few particles of melted ice there, not enough to cover the crosswalk, and it seemed to be composed more of cinders.   *   *   *

"*Q.* Mr. Atkinson used the expression 'a step.' Do you understand just what he meant by that?

"*A.* No, sir.

"(*Mr. Atkinson:* I got the expression from the witness. He said, 'I miscalculated my step.'

"*Mr. Robinson:* But by that expression he does not mean a step up or down in the walk.

"*The Court:* There was no question about what he testified this morning. He said there was a depression there, and he misjudged it.

"*Mr. Robinson:* Yes, sir; that is all right.)"

A witness for plaintiff testified:

"*Q.* You stated in response to Mr. Atkinson's question there was always a drop there and then a drop at the time of the accident. Now distinguish between those two drops, please.

"*A.* Well, at one time there, the crosswalk of the alley came almost up to the top of the sidewalk on the bridge, but there always was a sort of little drop there of probably a couple inches. It didn't amount to anything, but for about four or five months prior to January, 1908, there was a larger drop there. Around that time there was quite a large drop on the eastern side of that sidewalk.

"*Q.* I show you Exhibit G, Mr. Baxter, and ask you to show to the court and jury just about where that walk started to slope, or from where the drop started.

"*A.* Well, the drop started near the iron pipe, I think it is a gas pipe, and it sloped down across towards the east. And either on this part here—this is the eastern part of the sidewalk—here is where the largest drop was.

"*Q.* And where did it start from ?

"*A.* It started from the west side of the sidewalk here, near this pipe. The drop over on the western side wasn't so large as on the eastern side, but the ground sloped down.

"*Q.* How big a drop was there just previous to this accident on the eastern side of this walk ?

"*A.* I should judge there would be a drop of possibly 10 or 12 inches there.   *   *   *

"*Q.* Any defect in the crosswalk itself, except this drop from the end of the bridge sidewalk to that crosswalk ?

"*A.* There wasn't a crosswalk there; that is the sum and substance of it.

"*Q.* None there to be defective?

"*A.* No; there was just a drop, and practically a hole there in the side of the crosswalk.

"*Q.* A hole means something to the jury, and something to me, and something to you. Now let me see if you use the word 'hole' definitely and frankly. What do you mean by hole?

"*A.* I mean an excavation; not exactly an excavation, but a depression.

"*Q.* A hole means a decided excavation at some particular place?

"*A.* Yes, sir.

"*Q.* And do you mean to say there was any place there where there was a hole?

"*A.* I do not mean to say there was an excavation, but there was such a drop there.

"*Q.* You do not mean to say that this whole crosswalk was ever lower than the alley east of it, do you?

"*A.* The alley east of it?

"*Q.* Yes, immediately alongside of it.

"*A.* I do not understand that question.

"*Q.* From this crosswalk to the east runs an alley; do you mean to say that this crosswalk was lower than the alley?

"*A.* Yes, sir; at the corner of the bridge.

"*Q.* You do?

"*A.* Yes, sir.

"*Q.* At what time?

"*A.* From the fall of the year and the winter.

"*Q.* Will you please tell me how anybody could get on Twelfth street, which was still higher than the alley?

"*A.* They would walk across.

"*Q.* How could a team or traffic coming through that alley, down into this place where this crosswalk was, lower than the alley, how could they get out on Twelfth street?

"*A.* You asked the question whether it was lower on the eastern side of that alley than it was at the northern part of it, and I answered it 'yes.'

"*Q.* No, I didn't ask any such question. I asked you if you knew at any time when that crosswalk was lower than the alley to the east of it?

"*A.* Than the alley to the east of it?

"*Q.* Yes.   *   *   *

"*A.* Yes, sir; it was.

"*Q.* So that as one drove from Twelfth street west, he drove into a hole where a crosswalk ought to be?

"*A.* Well, it wasn't—

"*Q.* Then he drove up in the alley out of that hole?

"*A.* Well, yes, if he were driving that way.

"*Q.* When did that exist?

"*A.* That existed in the fall of the year.

"*Q.* In the fall of 1907?

"*A.* Fall and winter of 1907; yes, sir.

"*Q.* How much higher was the Twelfth street pavement than the surface of this hole, where the crosswalk ought to be?

"*A.* I should think that would be possibly a foot and a half.   *   *   *

"*Q.* A team going east over Twelfth street, driving across this alley crosswalk, would first of all drive into this hole, where this alley crosswalk would be?

"*A.* Yes, sir.

"*Q.* A foot and a half deep, lower than the Twelfth street pavement?

"*A.* I think it was.

"*Q.* And back up on Twelfth street pavement, there was a hole where an alley crosswalk would be, that was a foot and a half deep?

"*A.* No, I didn't say anything of the kind.

"*Q.* Let me get you right; this alley crosswalk was next to the pavement on Twelfth street?

"*A.* Yes, sir.

"*Q.* There was a hole where the alley crosswalk should have been a foot and a half deep?

"*A.* On the eastern side of the crossing, I said.

"*Q.* On the eastern side of the crosswalk?

"*A.* Yes, sir.

"*Q.* Only in a portion, and where the crosswalk ought to have been?

"*A.* Yes, sir.

"*Q.* A team driving from Twelfth street into that alley would drive down into this depression or hole from Twelfth street, and then would have to drive up again to get into the alley?

"*A.* It would not be a regular drop, but they would have to drive down that depression and drive up again.

"*Q.* So that you have seen that alley crosswalk when it was lower than the alley to the eastward?

"*A.* Yes, sir; I think it is yet.  *  *  *

"*Q.* Mr. Baxter, as I understand, there was a depression there.  Now, how long or how wide was this depression across the top?

"*A.* Across the top?

"*Q.* Yes, on the easterly side of the bridge?

"*A.* Possibly it would be about three feet, possibly four feet.

"*Q.* Then it didn't stretch across the whole alley?

"*A.* No, it didn't stretch across the whole alley, nor across the alley crosswalk.

"*Q.* Then if a team went in on the north side of the alley, state whether or not it would have to go through this hole?

"*A.* No, sir; it wouldn't have to go through this hole."

"By *Mr. Atkinson: Q.* Now listen, Mr. Baxter.  A man passing in the daytime from the Twelfth street bridge, and looking where he was going, seeing this depression down by stepping a few feet to the side one way or the other of this depression, not covering more that two feet in width, could they have gone by in perfect safety?

"*A.* If he had seen it, and stepped to one side.

"*Q.* Was there anything there to prevent his stepping to one side?

"*A.* Not if he had noticed the hole; he could easily have stepped to one side.

"*Q.* Was there any obstruction at that time about that bridge that is not now disclosed in this picture?

"*A.* Any obstruction, in what way?

"*Q.* Of any sort; is there anything to prevent a man coming down from the Twelfth sidewalk, from the bridge, stepping to one side or the other, that is not shown now in that picture?

"*A.* No, sir."

We think the testimony for plaintiff tends to prove that at the end of this bridge, and not necessarily visible or observable by a stranger approaching it, there was a considerable depression, not a step planned and made by the city, in the place once occupied by a board crosswalk across the alley, which walk had decayed and had been removed or filled in with crushed stone or cinders or both.

Into this depression, plaintiff, a stranger to the locality, stepped, noticing at the instant that he stepped, and not before, that there was a depression. The proper inferences to be drawn from his testimony, and the condition of the highway, are not so certain that it can be said, as matter of law, that plaintiff was negligent in not observing the condition of the street, or in assuming that he might step from the end of the bridge in safety. And the inference that plaintiff deliberately stepped into the depression after calculating its depth and his own safety—an inference apparently indulged by the court as the basis for the ruling complained about—is not the only reasonable inference which may be drawn from the testimony.

The court erred in directing a verdict.

The judgment is reversed, and a new trial granted.

HOOKER, MOORE, McALVAY, and BROOKE, JJ., concurred.